Good morning, Your Honors. My name is Catherine Toscanari. I'm representing the clinic of Christy Melfish. I will attempt to serve a few minutes for you. The primary issue in this case is the record of Dr. O'Connor, the only standing psychologist. In this case, he's completely unconscious. Because he was called in as a mom after the hearing, no reviewing psychologist from the agency has looked at the record. Dr. O'Connor was asked to test him and see if he had anxiety and a pain disorder. In other words, the pain disorder indicates that the clinic has psychological factors playing a significant role in the severity of the pain. The agency asked Dr. O'Connor specifically to administer validity testing in this case. All of it was normal, indicating that confidence could be taken in the results of all the other instruments that were administered during the evaluation. As part of the examination, he administered personality testing, which has its own word in the measure. This reveals that the clinic admin is not complying with the diagnosis of the pain disorder application. Dr. O'Connor also did testing that revealed an extremely low ability to process simple visual material, so low as 70% of the time. Dr. O'Connor was also told to be on his medical leave and should stay at home. Dr. O'Connor's diagnosis was on a normal basis. The diagnosis of the pain disorder indicates that the clinic admin is not complying with the diagnosis of the pain disorder application.  These psychological factors that are intensifying the onset of the exacerbation of the severity of the pain. Now, Dr. O'Connor was very well aware that she exaggerated, and that's why he diagnosed her with a piece. There's actually, there's several diagnoses under the category of somatic form disorder, pain disorders, one of them where you do have underlying conditions, but psychological effects. But you can also have a condition where you actually have a problem that's not been diagnosed, but you have significant pain. And that would be more like a somatic form disorder or even a conversion disorder. Now, EOJ here did not find the claim to be lingering. EOJ found, and I quote, that the claim that the significance was limited by her medically determinable appearance, and he found that these could reasonably be expected to cause the symptoms she alleged. We're only talking about the extent of her limitations related to these conditions. It is our argument that in determining this, the extent to which she's limited, the EOJ should have considered that the claim was a pain disorder. Now, a piece disorder may look the same as exaggerating one's symptoms, but in fact it is a psychological impairment, and it is recognized by the agency analyst, they recognize that a pain disorder can be, that under the category of somatic form disorder generally, can be, so to say, when one could make a mistake. I think EOJ has done so well. If EOJ was able to say, well, I'm not going to look at that, if EOJ is not able to show the conditions for all the symptoms that you're saying, you can do very well to put serious pain out of my face. But what EOJ did not do was to show the symptoms that you're able to take very well, and she's inconsistent with imposing this very simple error order to show that there's more to it than that. She can't be testable and see if you're able to say something that's good. The question goes, well, I'm going to assume that EOJ is not going to look at all the other symptoms you're able to do, and that doesn't make EOJ the person that we are saying I'm supposed to look at. Your Honor, I understand that EOJ did talk about her activities in the commission of PISTA, but EOJ did not talk about her pain disorder. She did not talk about the conclusions that the doctor made after all the subjective testing that he did. He did do objective testing, and he did show some objective impairment. He showed that she had the extremely low processing and the personality disorder, which was valid and did show the somatic complex. The problem, our objection here is that certainly EOJ is always referred to in daily activities to contradict the commission. He did not even address Dr. O'Connell's pain disorder. He did not dispute that there was a pain disorder, and he didn't dispute the doctor's conclusions. Your Honor, EOJ says that there is this issue that there is a pain disorder, and Dr. O'Connell's pain disorder is a symptom severely impacted by her ability to talk. Your Honor, he did not say that Dr. O'Connell was, he did not acknowledge that Dr. O'Connell said that the pain could be severely impacted by her ability to talk. Your Honor, EOJ did not dispute that Dr. O'Connell said that the pain could be severely impacted by her ability to talk. Your Honor, my argument is that when EOJ was looking at Dr. O'Connell's report, he did not address two things. He did not address the doctor's opinion that somatic problems would cause resistance, and would have a significant impact on her ability to interact appropriately with coworkers and supervisors. He did not acknowledge that. In my reading of this, he acknowledged that Dr. O'Connell wrote a report and concluded that Dr. O'Connell found no objective findings. Those clearly are the results of Dr. O'Connell's report. Thank you, Your Honor. Thank you. Good morning. My name is Courtney, and I'm a survivor. Good evening. How's your condition? Is everything great? This pain's really starting to come on, and again, we can just go to belly here. It has reached the point that Dr. O'Connell did find that there was a huge scar. So, my question is to you. Why was the issue of your condition such a big one? It's actually a big one. It seems to me that there seems to be some sort of shift. I mean, you know, there's an issue of health. You know, you talk about a lot of these issues. I'm very honest with you. The question I have for you is this. When you pass a clear characterization of a disorder, you're supposed to incorporate it into the work of the agency. So, should you work with the agency? First of all, I think that Dr. O'Connell is showing that she's not exaggerating her pain because it's a big scar. She's very happy with the fact that there's such a big scar. In fact, she tells me often now where she was walking back and forth, and then she's here to consult her. She's not running back and forth. That's really weird. But, generally, in my entire doctorate experience, and I've heard it more than 14 times this past year, she's saying it's not going to be an issue. What's this issue she's talking about? So, although there's a lot of pain that can be made to be a disorder, there is this point of shift. I think that there's a clear characterization of the fact that Dr. O'Connell is here to interview her. She may not be saying that this is a disorder. It's an exaggeration, of course. What was your interpretation of the interview? My interpretation is that it is a complete part of the interview. It's a managerial interpretation, but there's a lot of positive things in it. As I mentioned, Dr. O'Connell is a lawyer, so Dr. O'Connell is here to interview her. She may not be saying that this is a disorder. It's an exaggeration, of course. But, generally, in my entire doctorate experience, and I've heard it more than 14 times this past year, she's saying it's not going to be an issue. And she's going to have a chance to explore what she had to do for me. So, a lot of that being noted, most of Dr. O'Connell's findings are actually clear. There were two key theories, specifically, she said that there wasn't a specific key. For example, Dr. A.B. Aker, which is a volunteer pediatrician, and Dr. A.B. Aker, who is a pediatrician, is a working model. Dr. A.B. Aker, who is a working model, is a working model. Which is, of course, a positive thing. I would say, based upon previous programs, whether you're a pediatrician, a pediatrician, or a pediatrician, based upon previous programs, whether you're a statute of health, and even the last one, just a support, it's not necessary to make a determination of the case. And this is only a preliminary answer, or a possible determination of the case, in my opinion. So, going on track to 19, the second paragraph, of course, I felt that Dr. A.B. Aker was a more significant decision. She came to me for a decision. So, in the larger, I think, scenario, in the second paragraph, I felt that Dr. A.B. Aker was a more significant decision. And I felt that Dr. A.B. Aker was a more significant decision. Showing who was signing it? No, her name. After the signing, I got a blank cheque. Did you? That also was a significant decision. Well, the presentation, I felt that A.B. Aker and A.B. Aker, among these of them, would be different. And Dr. A.B. Aker is a clinical innovation technology that's certainly improved in our eachsen office, and we have to find a way to compensate them. And in putting this together, you can see what we did in the survey is Dr. A.B. Aker and Dr. A.B. Aker completed on the lack of statisticians. And that's true. If you look at how they should sit in front, almost all of them are in the research community and they are in the community. Dr. A.B. Aker, who came in the same way, who already stands as capable, brilliant, and spectacular, she not only did the research, but she also had a really active career since her time in the health care industry, for sure. And if you look at all of these people, we have to consider, if you're someone who also has a clinical history, or a clinical history, or a clinical record, who's a true function-taker, function-maker, function-all, then that's a very important part of the clinical evidence-making actions that we need to support for us to use the acceptance tools to be able to do this. I hear it's how you have these rates of highest in the health care community. Oh, so, you just got Eric. and as you said, you are a You say that  accounts up to 2 and a half hundred, if I remember correctly. So that's a huge difference. So if you're seeing Dr. O'Connor's diagnosis, the biggest reason is because there are more or less the same conditions around the community. And so, as you said, I just believe there's a difference and that's why I'm here. This year, the majority of our patients are in the same situation. Today, Dr. O'Connor's been doing the  for patients that need this. So, I mean, don't even say I don't know. You have to ask Dr. O'Connor's recommendations and look at the text of Dr. O'Connor's recommendations at all because of same behaviors. And, he said same behaviors mean people are more self-confident. Yes, same behaviors depend on  certain same behaviors and cultures, which would be, you know, clear same behaviors. Dr. O'Connor, she's covering other behaviors across the exam and I think Dr. O'Connor also believes that in this year, it's not just that her view of her is exaggerated. She's exaggerated and I think that's one of the other things that Dr. O'Connor has said that I don't understand. Okay, so, Dr. O'Connor mentioned some myths in the previous paragraph. Dr. O'Connor has been truly obsessive and why did Dr. O'Connor say that? Because that is one of    Dr. O'Connor  been     Dr. O'Connor say  Because that is one of the myths that Dr. O'Connor has been said that?             why did Dr. O'Connor say that? Because that is one of the myths that Dr. O'Connor has been obsessive   did Dr. O'Connor  that?      that Dr. O'Connor has been obsessive and why did Dr. O'Connor say that? Because that is        been obsessive and why did Dr. O'Connor say that?
judges: Kozinski, Fisher, Watford